**Nilza I. WARK, Plaintiff**

v.

**Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.**

**CIVIL ACTION NO. 3:13–2502**

United States District Court, M.D. Pennsylvania.

Signed April 7, 2015

636

Steven M. Rollins, Rollins Law Office, Harrisburg, PA, for Plaintiff.

G. Michael Thiel, U.S. Attorney's Office, Scranton, PA, for Defendant.

## ORDER

MALACHY E. MANNION, United States District Judge

Based upon the memorandum issued this same day, **IT IS HEREBY OR-DERED THAT:**

(1) the report and recommendation of Magistrate Judge Cohn issued in the above-captioned matter, (Doc.

20), is **ADOPTED IN ITS EN-TIRETY**;

(2) the decision of the Commissioner denying the plaintiff's disability insurance benefits is **VACATED** and the matter is **REMANDED** for further proceedings in accordance with the report of the magistrate judge; and

(4) the Clerk of Court is directed to mark this action **CLOSED**.

### *MEMORANDUM*

Pending before the court is the report of Magistrate Judge Gerald B. Cohn, which recommends that the decision of the Commissioner of Social Security denying the plaintiff's social security disability insurance be vacated and the action be remanded to the Commission to further develop the record, conduct a new administrative hearing and appropriately evaluate the evidence of record. (Doc. *20*). Both the plaintiff and defendant have waived their opportunity to object to Judge Cohn's report and recommendation. (Doc. *21*, Doc. *22*).

Where no objection is made to a report and recommendation, the court should, as a matter of good practice, "satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b), advisory committee notes; *see also Univac Dental Co. v. Dentsply Intern., Inc.,* 702 F.Supp.2d 465, 469 (M.D.Pa.2010) (citing *Henderson v. Carlson,* 812 F.2d 874, 878 (3d Cir.1987) (explaining judges should give some review to every Report and Recommendation)). Nevertheless, whether timely objections are made or not, the district court may accept, not accept or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); Local Rule 72.31.

The court has reviewed each of the recommended bases presented by Judge Cohn for vacating and remanding the instant action. Because the court agrees with the sound reasoning that led Judge Cohn to the conclusions in his report and finds no clear error on the face of the record, the court will adopt the report in its entirety. An appropriate order shall issue.

### REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND THE CASE TO THE COMMISSIONER FOR FURTHER PROCEEDINGS

### *REPORT AND RECOMMENDATION*

#### GERALD B. COHN, UNITED STATES MAGISTRATE JUDGE

### I. Procedural Background

On March 17, 2010, Nilza I. Wark ("Plaintiff") protectively filed an application for Title II disability insurance benefits ("DIB"), with a disability onset date of June 4, 2009. (Administrative Transcript (hereinafter, "Tr."), 13). After the claim was denied at the initial level of administrative review, the administrative law judge ("ALJ") held a hearing on November 15, 2011. (Tr. 26–51, 359–404). On February 23, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 10–25). On April 20, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 8–9), which the Appeals Council denied on May 11, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1–7).

On October 3, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the

Commissioner of the Social Security Administration denying social security benefits. (Doc. 1). On January 29, 2014, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings. (Doc. 7, 8). On May 13, 2014, Defendant filed a duplicate supplemental administrative transcript. (Doc. 11). On June 19, 2014, Defendant filed a subsequent supplemental administrative transcript. (Doc. 14). On July 18, 2014, Plaintiff filed a brief in support of the appeal. (Doc. 15 ("Pl. Brief")). On August 20, 2014, Defendant filed a brief in response. (Doc. 16 ("Def. Brief")). On September 3, 2014, Plaintiff filed a reply brief. (Doc. 17). On November 05, 2014, the Court referred this case to the undersigned Magistrate Judge.

## II. Relevant Facts in the Record

Plaintiff was born on June 19, 1967, and thus was classified by the regulations as a younger person through the date of the ALJ decision rendered on February 23, 2012. (Tr. 155); 20 C.F.R. § 404.1563(c). Plaintiff alleges the following impairments: major depressive disorder; panic disorder with agoraphobia; and, depersonalization disorder. Pl. Brief at 3; (Tr. 15).

Plaintiff completed the twelfth grade and attended, but did not complete a business program in 1998. (Tr. 179, 332–33). Plaintiff worked from 1995 until 1998 as an employee relations clerk for a manufacturing company. Pl. Brief at 2. In 1998 Plaintiff started working for the Commonwealth of Pennsylvania as a clerk typist. (Tr. 180, 238–43). Plaintiff then worked as a human resource assistant from 1999 to 2004. (Tr. 180). Plaintiff's last position was as a human resource analyst from 2004 until 2009. (Tr. 180, 196–226, 238).

During the period relevant to this case, Plaintiff lived either with her husband or following her divorce, alone with her two dogs. (Tr. 169, 381–82). She maintained a driver's license and was able to drive twice a week to shop for groceries and go to a laundromat. (Tr. 172, 191, 382). Plaintiff cared for her personal needs, cooked, kept her apartment in order, performed household chores, played games on the computer, socialized with family, talked on the phone daily, walked for exercise, read, used the internet, traveled out of state, and flew to Puerto Rico. (Tr. 171–73, 188–90, 192, 345–348, 394–95). Plaintiff had a boyfriend, and they occasionally went out for dinner. (Tr. 385, 395).

### A. Relevant Treatment History and Medical Opinions

#### 1. Treating Psychiatrist Peter Hartmann, M.D.

Plaintiff has a history of sexual and physical abuse as a child, depression, and panic attacks. (Tr. 280, 330–32). She attempted to commit suicide at the age of seventeen and again in 2005, both attempts were before her alleged disability onset date. (Tr. 266, 274, 280, 389–90). Beginning in 2005, Plaintiff commenced mental health treatment with Dr. Hartmann. (Tr. 230). According to Dr. Hartmann, Plaintiff has been having panic attacks since around 2004. (Tr. 287). Around the time of the alleged onset date and since, Dr. Hartmann characterized Plaintiff as having a mood disorder with panic attacks, and saw Plaintiff for routine medication management. (Tr. 282–91, 328–29, 355–58). On March 24, 2009, Plaintiff reported that she felt better than 'a few weeks ago,' and that she was stressed at work. (Tr. 290). Dr. Hartman noted that Plaintiff had increased depression stressors in work environment which had triggered depression and inadequacy. (Tr. 290). Plaintiff's medication was increased and Plaintiff reported slowly feeling better, however, sleeping a lot and still feeling tired. (Tr. 290).

Between April 1 and April 3, 2009, Plaintiff voluntarily sought inpatient psychiatric care at York Hospital after experiencing increased anxiety and depression due to work stressors. (Tr. 265–77). Plaintiff denied a suicidal plan, but was concerned she could become actively suicidal at some point. (Tr. 265). Following treatment with medications and therapy, Plaintiff's condition improved and she was discharged. (Tr. 265–68). At the beginning of her inpatient treatment, Plaintiff's Global Assessment of Functioning (GAF) score was 38 and improved to 55, upon discharge. (Tr. 267). Upon discharge, Plaintiff related well, exhibited normal speech, a clear sensorium, at least average intellect, an anxious and depressed mood, and no psychosis or abnormal mannerisms. (Tr. 267).

Between April 16, 2009, and October 2011, Plaintiff attended routine visits with Dr. Hartmann approximately on a monthly basis. (Tr. 282–91). In May 2009, she reported ongoing panic attacks and depressive symptoms caused by work-related stress. (Tr. 287–88). At later visits, however, she reported improvement in her symptoms. (Tr. 283). In June 2009, Plaintiff reported "marked improvement" in her mood with no panic attacks, but stated she was not ready to return to work. (Tr. 286). Dr. Hartmann observed that Plaintiff was animated, well dressed, and well groomed. (Tr. 286). He opined she could return to work at any point at which she felt capable. (Tr. 286). Since Plaintiff was "showing continuous improvement," Dr. Hartmann continued her medication regimen. (Tr. 286).

In July 2009, Plaintiff reported doing "much better" with no panic attacks for weeks, and that she had planned a one-week vacation. (Tr. 285). Dr. Hartmann reported she could return to work in August, and made no medication changes since she was doing well. (Tr. 285). However, in August 2009, Plaintiff reported having anxiety and panic attacks when she thought about returning to her job, but no panic attacks when she did not think about returning. (Tr. 284). Plaintiff reported previously having a challenging work situation, and decided to move to North Carolina to live closer to her brother. (Tr. 284). Since Plaintiff felt "okay" when not thinking about a return to her current job, Dr. Hartmann continued her medication regimen. (Tr. 284). In September 2009, Plaintiff expressed excitement and optimism about her upcoming move; Dr. Hartmann stated "her mood state continues to do well," and made no changes to her medication regimen. (Tr. 283).

In February 2010, Plaintiff stated that her move to North Carolina did not work out, so she and her husband had returned to the York area. (Tr. 282). Dr. Hartmann reported that Plaintiff was doing "reasonably well" given the struggles she had in North Carolina, made no medication changes, and suggested follow-up in three to six months given that she was uninsured. (Tr. 282). In May 7, 2010, Plaintiff reported that her "depression remains under control." (Tr. 291). Despite her reports of a few mild panic attacks, Dr. Hartmann found no reason to adjust her medications. (Tr. 291).

Nine months later, in February 2011, Plaintiff returned to Dr. Hartmann reporting "a lot of stress" due to her recent divorce and financial problems. (Tr. 329). She denied suicidal thoughts, maintained good eye contact, and exhibited normal speech and goal-directed thoughts, although she appeared teary-eyed when discussing her personal stressors. (Tr. 329). Dr. Hartmann opined that Plaintiff's mood disorder appeared to have worsened, "understandably" due to her grieving, so he recommended a medication adjustment.

(Tr. 329). The following month, Plaintiff reported continued anxiety, along with other symptoms which Dr. Hartmann suspected were related to the medication change. (Tr. 328). Plaintiff reported feeling "not that good but not that bad," and Dr. Hartmann adjusted her medications. (Tr. 328).

In May 2011, Plaintiff reported doing "OK" with improved sleep. (Tr. 357). Plaintiff reported having less severe panic attacks, which occurred daily but not as frequently. (Tr. 357). Because Plaintiff "was doing better than she was," Dr. Hartmann continued her medications. (Tr. 357). In July and October 2011, Plaintiff reported doing "OK" with no significant deterioration in her condition. (Tr. 355–56). She denied suicidal thoughts and reported occasional panic attacks that were not very strong. (Tr. 355–56). In July 2011, Plaintiff declined a medication increase since she was "doing acceptably well at this point," and Dr. Hartmann reported that she was taking less medication than had been prescribed. (Tr. 356). In October 2011, Plaintiff reported having "a new man in her life" who was a "nice guy," but admitted that she had become dependent on him for her entire social life. (Tr. 355). Dr. Hartmann advised Plaintiff to expand her social life by going to church. (Tr. 355). At both visits, he continued her medications with no changes. (Tr. 355–56).

On December 26, 2011, Dr. Hartmann submitted a letter to Plaintiffs attorney vaguely stating that he agreed "100%" with the diagnosis and functional limitations articulated in an unspecified report provided by, Dr. Revell. (Tr. 358).

### 2. Treating Psychologist Dr. Revell

Plaintiff began attending psychotherapy treatment with Dr. Revell in January 2008 until November 2011 for approximately seventy sessions. (Tr. 32, 278–81, 292–301, 323–27, 330–48, 363–78). According to short session summaries dated between May 2009 and November 2011, Plaintiff primarily discussed conflicts relating to her boyfriend and family members. (Tr. 342–48).[1] Over this period, Plaintiff divorced, rekindled a romantic relationship with her second-cousin, moved into her own apartment, took a trip to Puerto Rico, looked for jobs in North Carolina, and tried to "keep herself busy at home." (Tr. 345, 348).

The notes also briefly hint that interpersonal conflicts at work may have been an aggravating precipitating factor to her increased symptoms. (Tr. 347–348). For example: in a note dated May 9, 2009, while discussing work, Plaintiff was recalling when she was able to stand up for herself; on May 16, 2009, while referring to being unable to return to work, Plaintiff named two people that did not talk to her anymore and another co-worker giving her a problem about leave; on June 6, 2009, Plaintiff said that her boss gave her a written reprimand after filing a complaint about the boss and that she planned to follow up with the complaint and was appealing the reprimand; on July 2, 2009, Plaintiff indicated that she hated feeling left out, and it appears to be with reference to fears of returning to work; and, on October 19, 2009, Plaintiff indicated that she registered her complaint about the disciplinary action. (Tr. 347–348).

Out of the approximately fifty total session summaries from 2009 to 2011, Dr. Revell noted panic attacks on three different occasions: On September 2, 2010, where she experienced a vomiting panic

---

1. Dr. Revell declined to produce her actual treatment notes. (Tr. 363–64). The ALJ informed Plaintiff that the lack of treatment records could affect the weight accorded to Dr. Revell's opinion. (Tr. 29).

attack; on November 2, 2010, where her flight was late and a connecting flight was rescheduled, resulting in a panic attack at the airport; and, on February 7, 2011, where she had a "huge" panic attack after a physical fight with her boyfriend's sister. (Tr. 345–346).

Other reports of symptoms include: on March 24, 2010, Plaintiff was barely going out and shaming herself for not going to work; on April 6, 2010, Plaintiff reported that it was difficult to get out of the house; on April 27, 2010, Plaintiff reported that she was still having trouble getting out of pajamas every day; on May 19, 2010, Dr. Revell noted that Plaintiff reported that she was not getting a good response from the medication, yet the medication was not changed, and Dr. Revell opined that Plaintiff often minimized her symptoms because she felt ashamed; March 16, 2011, Plaintiff reported experiencing "odd symptoms" such as "depersonalization, tingling in fingers, and stopping breathing even when awake," symptoms which on April 8, 2011, Dr. Hartmann determined that they were depersonalization symptoms and not side-effects from medications; on August 3, 2011, Plaintiff reported that nightmares continued; on November 7, 2011, Dr. Revell noted that Plaintiff was really upset, very "symptomatic," and Plaintiff reported that she snapped angrily at her boyfriend, then wanted to hurt herself and she would break glasses followed by an impulse to cut herself and wished that someone else would hurt her. (Tr. 342–348).

In November 2009, Dr. Revell completed a form in support of Plaintiff's application for state disability and retirement benefits stating that Plaintiff could not

work. (Tr. 278–81). On May 17, 2010, March 20, 2011 and November 11, 2011, Dr. Revell wrote letters describing Plaintiff's mental health treatment history and symptoms. (Tr. 292–301, 330–41). Dr. Revell reported that Plaintiff was attractive, well groomed, appropriately dressed, friendly, and engaging, with normal orientation, good eye contact, clear and coherent speech, normal articulation, an anxious mood, a blunted affect, well organized thoughts, above average intelligence, good judgment, and good insight. (Tr. 295, 333–34). Dr. Revell noted that Plaintiff had difficulty making decisions and in response to stress, had phobias, obsessions/compulsions, and suicidal thoughts. (Tr. 295–96, 334). However, Plaintiff did not experience hallucinations, delusions, and other perceptual disturbances. (Tr. 295). Dr. Revell further noted that the Beck Depression Inventory and the Beck Anxiety Inventory indicated severe anxiety and depression.[2] (Tr. 296). In the March 2011 opinion, Dr. Revell, stated that Plaintiff had two to three panic attacks a day. (Tr. 326). In November 2011, Dr. Revell reported that Plaintiff's condition had deteriorated and that Plaintiff experienced daily panic attacks. (Tr. 339–41).

In check-box forms completed on May 17, 2010 and March 20, 2011, respectively, Dr. Revell opined that Plaintiff had work-preclusive mental limitations. (Tr. 300–01, 323–27). At the November 2011 administrative hearing, Dr. Revell testified that Plaintiff intentionally broken glass and attempted to cut herself due to shame and self-loathing, but does not hurt herself. Instead, she wishes someone else would

---

**2.** The Beck Depression Inventory and the Beck Anxiety Inventory are 21–item self-report questionnaires that assess the severity of depression and anxiety, respectively. It was specifically designed to reduce the overlap between depression and anxiety scales by

measuring symptoms shared minimally between the two conditions. *Eckstein v. Comm'r of Soc. Sec.*, No. CIV.A. 13–1111, 2014 WL 1371581, at *3 n. 5 & n. 6 (W.D.Pa. Apr. 8, 2014).

hurt her, which makes Dr. Revell concerned that Plaintiff would instigate a confrontation to achieve self-harm because Plaintiff feels a need to be punished. (Tr. 41–43). Dr. Revell testified that Plaintiffs condition had deteriorated and she was incapable of working. (Tr. 362–78). Dr. Revell also testified that Plaintiff downplays her symptoms or "fake good." (Tr. 47–48, 347).

### 3. State Agency Mental Health Consultant

On May 19, 2010, state agency mental health consultant Karen Weitzner, Ph.D., reviewed the record and opined that Plaintiff's mental conditions did not restrict her ability to perform daily activity; mildly limited her ability to maintain social functioning; moderately limited her ability to maintain concentration, persistence, or pace; and caused no repeated episodes of decompensation, each of extended duration. (Tr. 305–17). Dr. Weitzner concluded that Plaintiff was "not significantly limited" in most areas of mental work-related functioning and only "moderately limited" in a few areas. (Tr. 302–03). With respect to Plaintiff's mental RFC, Dr. Weitzner opined:

She is able to understand and complete at least simple, routine tasks. Claimant is limited in her ability to cope with increased responsibility and routine changes. She is able to get along with others and use adequate social judgment.

The claimant can make simple decisions. She would be able to maintain regular attendance and be punctual. She would not require special supervision in order to sustain a work routine. She can sustain an ordinary routine without special supervision. Moreover, she can function in production oriented jobs requiring little independent decision making. The limitations resulting from the impair-

ment do not preclude the claimant from performing the basic mental demands of competitive work on a sustained basis. There are no restrictions in her abilities in regards to understanding and memory and social interaction.

(Tr. 304).

### III. Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

[H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer v. Apfel,* 186 F.3d 422, 428 (3d Cir.1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) wheth-

er the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

■ The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

■ When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir.2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir.2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564, 108 S.Ct. 2541,

101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir.1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995)), and may be less than a preponderance. *Jones*, 364 F.3d at 503. If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.1999); *Johnson*, 529 F.3d at 200.

## A. Weight Accorded Medical Opinions

■ Plaintiff contends that the ALJ failed to accord proper weight to the treating source opinions of treating licensed psychologist, Dr. Revell and treating psychiatrist Dr. Hartmann. Pl. Brief at 9–13. Specifically, Plaintiff argues that the ALJ erred in finding Plaintiff's treatment did not support the limitations her specialists believed she experienced. Plaintiff further contends that the ALJ erred by relying on a statement by Plaintiff's ex-husband to reject the opinions by the medical specialists. Pl. Brief at 11.

With regards to Plaintiff's argument "that a patient functions better in a non-work setting does not prove the patient could work...." (Pl. Brief at 12) given that the ALJ determined that Plaintiff could not return to previous type of work and accounted for subsequently acquired limitations in interacting with people, the Court finds no error.

The ALJ assigned "significant weight" to the state agency opinions as they were "well supported by and consistent with the record." (Tr. 19). The ALJ assigned

"limited weight to Dr. Revell's opinions, including her numerous written opinions and her testimony." (Tr. 19). The ALJ explained that Dr. Revell's opinions were "inconsistent with treating source records from [Dr. Hartmann], the degree and type of care the claimant needed following her April 2009 hospitalization, and the balance of the record, including a written report from the claimant's ex-husband." (Tr. 19). The ALJ continued that "[a]lthough [Plaintiff] has received regular care, it has been conservative and consists of office visits with Drs. Revell and Hartmann."[3] (Tr. 19).

The ALJ also assigned "limited weight" to Dr. Hartmann's opinions in December 2011 where he indicated he agreed with Dr. Revell's diagnosis and resulting functional limitations, "as this opinion is inconsistent with his own treatment records, which indicated far less problems." (Tr. 19). The ALJ elaborated that Dr. Hartmann's treatment notes indicated that she was doing well, she was divorced and had a new boyfriend, and she was sleeping better. (Tr. 19). The ALJ continued, stating that Dr. Hartmann indicated in September 2009 that Plaintiff s mood was well although she had some difficulty sleeping. (Tr. 19). The ALJ noted that Dr. Hartmann only needed to see the claimant a few times a year and the record indicated that she was doing relatively well in a number of his office visits, "this does not sound like the extremely limited person described by Dr. Revell."

The ALJ gave "some weight" to the report of Plaintiff's ex-husband who indicated that Plaintiff could do a wide range of activities of daily living. (Tr. 19). The ALJ noted that Plaintiff's ex-husband stated that that, although she could be forgetful, she followed written and spoken instructions very well, but she did not handle stress as well as she did in the past. (Tr. 19).

■ "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429). The applicable Social Security regulations instruct that:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations....

20 C.F.R. § 404.1527(c)(2); *see also Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir.2001). If a treating source's opinion as to the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling

---

**3.** The ALJ erred in discounting the treating psychiatrist's and licensed psychologist's medical opinions based on the ALJ's own lay opinion that the their treatment was "conservative." *See Morales v. Apfel*, 225 F.3d 310 at 317–18; *see also Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir.2008) (The ALJ may not impose his notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered). This error, however, is harmless in light of the fact that the ALJ credits the opinion of Dr. Weitzner and gave other valid reasons.

weight." 20 C.F.R. § 404.1527(c)(2); *see also* SSR 96–2p. After undertaking this analysis, if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he or she must then determine what weight to give the opinion. The ALJ must do so by considering the following factors: length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, the degree to which the physician presents relevant medical evidence in support of the opinion, the consistency of the opinion with the record as a whole, the degree to which the opinion relates to an area in which the physician specializes, and any other factors "which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(2).

Where a treating source's opinion conflicts with that of a non-examining source, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317. An ALJ may reject a treating physician's opinion as long as the rejection is due to contradictory medical evidence, rather than the ALJ's "own credibility judgments, speculation, or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (citation omitted).

In this case, the ALJ discussed the opinions of Plaintiff's treating licensed psychologist Dr. Revell and treating psychiatrist Dr. Hartmann, and concluded that they were not entitled to significant weight because they were contradicted by the contemporaneous treatment notes from Dr. Hartmann. (Tr. 19). The ALJ correctly observed that Dr. Revell's opinions are in stark contrast to the treatment records from Dr. Hartman and the non-treating opinion evidence. The Court also notes that with regards to Dr. Revell's opinions, it is difficult to interpret the significance of her post hoc summaries of contemporaneous treatment records given that such summaries would entail a level of editing, which makes it unclear whether relevant facts or patterns were omitted. Ultimately, this case turns on resolving conflicting medical evidence which includes evidence that a plaintiff minimizes [4] the extent and severity of his or her own symptoms.

It is the administrative law judge's job to resolve conflicting medical evidence. *See Richardson v. Perales*, 402 U.S. 389, 399, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It is also within the province of the administrative law judge to make credibility determinations as to a claimant's report of his or her limitations. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir.1983); *see e.g., Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir.2009). An ALJ is not bound by a treating medical

---

4. Courts and medical professionals use various terms describe the act of minimizing the severity of symptoms, such as understate, downplay, play down, lacking judgment and insight into the extent of one's own impairment, the opposite of malingering, or as in this case, Dr. Revell refers to the Plaintiff's minimizing of symptoms as "fake good." *See e.g., Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir.1996) ("it is common knowledge that depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness."); *Kegler v. Colvin*, No. 12–CV–413–WMC, 2014 WL 4538117, at *1 (W.D.Wis. Sept. 11, 2014); *Quillin v. Astrue*, No. 2:10–CV037, 2011 WL 9004, at *8–10 (E.D.Term. Jan. 3, 2011); *Reid v. Astrue*, No. 1:07–CV0577(LEK), 2010 WL 2594611, at *9 (N.D.N.Y. June 23, 2010); *Oppegaard v. Astrue*, No. C09–768–JPD, 2010 WL 1406379, at *9 (W.D.Wash. Mar. 31, 2010); *Leon v. Astrue*, No. 08 C 7430, 2010 WL 934043, at *4 (N.D.Ill. Mar. 5, 2010); *Shore v. Callahan*, 977 F.Supp. 1075, 1079 (D.Or. 1997); *Mauro v. Comm'r of Soc. Sec.*, No. 07–12095, 2008 WL 495362, at *4 (E.D.Mich. Feb. 20, 2008) ("Plaintiff is not a malingerer; indeed, he seems to downplay his impairments").

source's opinion as to the truthfulness of a claimant's report of symptoms and limitations. *See Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983); *Verduin v. Comm'r of Soc. Sec.,* No. 1:08–CV–698, 2009 WL 3153016, at *3 (W.D.Mich. Sept. 24, 2009) (finding that where a plaintiff argued that doctors had not doubted the truthfulness of her statements regarding her symptoms, such argument lacked merit, concluding that "[c]redibility determinations with respect to subjective complaints rest with the ALJ"); *cf. Coney v. NPR, Inc.,* 312 Fed.Appx. 469, 474 (3d Cir.2009) (citing *United States v. Whitted,* 11 F.3d 782, 785–86 (8th Cir.1993) ("A doctor . . . cannot pass judgment on [another witness'] truthfulness in the guise of a medical opinion, because it is the [fact-finder's] function to decide credibility.")); *Hartle v. FirstEnergy Generation Corp.,* 7 F.Supp.3d 510 (W.D.Pa.2014) ("Expert opinion about the credibility of other witnesses generally is not helpful as it undermines the [fact-finder's] credibility-finding function"); *Kovacic v. Ponstingle,* No. 1:05CV2746, 2014 WL 4715859, at *9 (N.D.Ohio Sept. 22, 2014) ("It is settled that 'a psychiatrist may not testify to the credibility of a witness; that issue is one for the [fact-finder]' ").

■ Nevertheless, an ALJ should consider explanations for disparities in a claimant's report of symptoms, including explanations from treating source opinions as to whether, why, or to what degree a claimant minimizes symptoms or is a malingerer. *See Adorno v. Shalala,* 40 F.3d 43, 48 (3d Cir.1994) (ruling that an ALJ must explicitly weigh all relevant, probative, and available evidence; and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition); *supra,* at note 3 (listing other jurisdictions wherein the issue of minimizing symptoms was raised).

Dr. Revell testified that Plaintiff downplays her symptoms or "fake good" and in a treatment summary note dated May 19, 2010, Dr. Revell stated that Plaintiff often minimizes symptoms due to shame. (Tr. 47–48, 347). Dr. Revell's opinion that Plaintiff minimizes her symptoms implies that the symptoms reported to Dr. Hartmann are not accurate, while perhaps, Dr. Revell sought to elicit from Plaintiff a more accurate report regarding the severity of symptoms. On December 26, 2011, Dr. Hartmann submitted a letter to Plaintiff's attorney stating:

I am writing you in reference to my patient, Ms. Soto, who is undergoing an evaluation for disability. I have thoroughly read the report provided by her psychologist, Dr. Elizabeth Revell, and I agree 100% with her diagnosis with resulting functional limitations.

(Tr. 358). It is possible that Dr. Hartmann agrees with the implication of Dr. Revell's opinion that Plaintiff minimizes symptoms and the December 2011 letter may also indicate that Dr. Hartmann no longer believes that his contemporaneous treatment records accurately reflected Plaintiffs symptoms. However, Dr. Hartmann's December 2011 letter is too vague to accurately interpret. In the December 2011 letter, Dr. Hartmann does not attach the referenced report from Dr. Revell, or independently reiterate with what Dr. Hartmann agrees regarding Plaintiffs symptoms and limitations. In the December 2011 letter, Dr. Hartman does not provide any explanation or foundation as to why he believes that Plaintiff's symptoms are more severe than what he reported in contemporaneous treatment records.

Given that the ALJ did not address Dr. Revell's assertion that Plaintiff minimizes symptoms and whether such a claim impacts the interpretation of Dr. Hartmann's treatment records, the case should be re-

manded for the ALJ to address in the first instance.

## B. Failure of Hypothetical to Account for Plaintiff's Impairments

█ Plaintiff argues that the ALJ failed to account for all of Plaintiff's limitations in the hypothetical to the Vocational Expert (VE). Pl. Brief at 14–17. Specifically, Plaintiff argues that the ALJ "found [Plaintiff] experienced 'moderate' limitations in social functioning and on the ability to maintain concentration, persistence or pace," yet in the hypothetical to the VE, "did not include the limitations ... in persistence or pace, or explain why he determined those limitations did not exist." Pl. Brief at 14. Plaintiff assets that "[e]vidence from [Plaintiff], her ex-husband, and Dr. Revell (which Dr. Hartmann endorsed) showed that, in addition to difficulty concentrating, Ms. Wark had issues completing tasks and remembering." (Tr. 16).

Central to Plaintiff's argument is how to interpret the ALJ's findings. In the February 2012 decision, the ALJ stated: "With regard to concentration, persistence or pace, the claimant has moderate difficulties due to some reported problems concentration and dealing with stress (Exhibits 2F and 3E)." (Tr. 16). In context with the evidence that the ALJ cites, the ALJ's findings are more limited than what Plaintiff asserts. Rather than finding that Plaintiff has "moderate" difficulties in every aspect of "concentration, persistence or pace," the ALJ has determined that Plaintiff had moderate difficulties in concentration and is limited to a low-stress job to the degree that such is supported by exhibits 2F and 3E. *See* (Tr. 16); (Tr. 169–176, exhibit 3E: Plaintiff's self-report of functions); (Tr. 278–281, exhibit 2F: Medical Report to "State Employe's [sic] Retirement System" by Dr. Revell). The evidence cited by the ALJ does not demonstrate moderate difficulties in ability to remember or complete tasks. (Tr. 169–176, 278–281). In Dr. Revell's medical report to the Pennsylvania state employee's retirement system dated November 7, 2009, Dr. Revell noted Plaintiff's response to stress and that Plaintiff reported absentmindedness and an inability to concentrate. (Tr. 280). Consistent with the VE testimony that Plaintiff could not return to previous work, Dr. Revell opined that Plaintiff's "return to previous level of functioning [was] not foreseeable." *Compare* (Tr. 280) *with* (Tr. 402). In the Self Report of Plaintiff s functions dated March 31, 2010, Plaintiff did not indicate moderate impairments with her ability to remember or complete tasks. (Tr. 169–176). With regards to memory, Plaintiff indicated that she did not need any special reminders to care for personal needs and grooming and Plaintiff wrote, that "[s]ometimes my husband has to remind me or ask if I took my medication." (Tr. 171). With regards to completing tasks, Plaintiff wrote "I clean when I know company is coming, but I am not told by anyone I have to clean. Everything is usually in the proper place and cleaning really only consists of dusting, sweeping, vacuuming + cleaning bathrooms + kitchen." (Tr. 171–172).

At the administrative hearing, the ALJ asked the VE to consider:

an individual of [Plaintiff's] age, education and work experience who has a residual functional capacity as follows. No exertional restrictions or limitations, not exertionally limited to routine, repetitive tasks as required by unskilled labor. No public contact, no close cooperation with coworkers to achieve job tasks. Routine ... production jobs requiring little independent decision making and involving only occasional change in work setting.

(Tr. 402). The VE testified that such a person could not perform Plaintiff's past work. (Tr. 402). The VE testified that with the above-specified limitations, an individual could do other jobs that existed in significant numbers in the national economy, including a kitchen helper, night cleaner, and office cleaner. (Tr. 65). Plaintiff does not assert that the ALJ's finding that Plaintiff's moderate limitation in inability to concentrate is not encompassed by "[r]outine ... production jobs requiring little independent decision making and involving only occasional change in work setting." Rather, Plaintiff argues that the ALJ failed to include limitations regarding ability to remember, complete tasks, and ability to maintain attendance at work, limitations that are not encompassed in the ALJ's RFC.

█ The Third Circuit has explained that "objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself." *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005). Where a plaintiff contends that the VE "testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert," such are challenges to the RFC assessment itself. *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir.2005).

█ In order for a vocational expert's answer to a hypothetical to be considered substantial evidence, the question must reflect "*all* of the claimant's impairments that are supported by the record." *Allen v. Barnhart*, 417 F.3d 396, 407 (3d Cir. 2005) (emphasis in original). Additionally, " 'great specificity' is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical." *Ramirez v. Barnhart*, 372 F.3d 546, 554–55

(3d Cir.2004) (internal citations omitted); *see also* SSR 96–8p (requiring a "more detailed assessment" of the claimant's mental limitations at step five of the disability analysis).

In this instance, Plaintiff's objection to the VE hypothetical is an attack on the RFC in that the ALJ did not find that the Plaintiff was significantly limited in ability to remember, complete tasks, or would be unable to meet attendance requirements for work. Regarding the severity of Plaintiff s limitations, such have been addressed in the above analysis of the ALJ's allocation of weight to the medical opinions in support of the ALJ's RFC determination. For the reasons discussed above, the ALJ's RFC is supported by substantial evidence. Where the adopted medical opinions did not indicate that Plaintiff had significant impairment in her ability to remember or complete tasks or that Plaintiff's limitations would preclude Plaintiff from attending work on a regular basis, the ALJ did not err in electing not to incorporate such limitations in the hypothetical to the VE.

## IV. Recommendation

Accordingly, it is HEREBY RECOMMENDED:

1. The decision of the Commissioner of Social Security denying Plaintiffs social security disability insurance be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence in accordance with the Court's above report; and

2. The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or

matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply.

A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: March 16, 2015